**CAPEK et al. v. LEVIS.**
**Patent Appeal No. 2832.**

Court of Customs and Patent Appeals.
Jan. 25, 1932.

BLAND and LENROOT, Associate Judges, dissenting in part.

John A. Hall, E. W. Adams, and John G. Roberts, all of New York City, for appellants.

D. Clyde Jones, of Rochester, N. Y., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

On September 6, 1924, the appellants Capek and Van Den Broecke filed their application in the United States Patent Office for a patent upon improvements in telephone systems. On September 4, 1925, the appellee, Levis, filed his application, which concededly covers the same subject-matter. An interference was declared. On this interference, Levis took testimony; the appellants, in their behalf, introduced certified copies of foreign patents covering the same subject-matter. None of these are important here, except the British patent, No. 228,593, granted upon an application filed October 8, 1923, and which is relied upon by appellants as their date for conception and constructive reduction to practice.

The counts of the interference are six in number. Counts 1, 3, and 5 are given as typical:

"Count 1. In a telephone exchange system, a calling subscriber's line, a first called subscriber's line having a certain resistance sleeve circuit, a second called subscriber's line having a certain other resistance sleeve circuit, a link circuit for interconnecting said calling line and either of said called lines, a supervisory relay in said link circuit operating when the called subscriber answers, a position meter associated with said link circuit, a marginal relay controlled over the sleeve of said link circuit and adapted to be operated when said link circuit is connected with one of said called lines and not with the other, and means jointly controlled by said supervisory relay and said marginal relay for operating said meter.

"Count 3. In a telephone system, a telephone line provided with a message-charging device, a plurality of other telephone lines, means including a cord circuit for interconnecting said first mentioned telephone line with any of said other telephone lines, an official telephone line, an operating circuit for said message-charging device, and discriminating means including a relay controlled in one manner over a telephone line and said cord circuit and in another manner over said official line and said cord circuit, said discriminating means functioning to control the closure of said operating circuit.

"Count 5. In a telephone exchange system, a calling subscriber's line, a first called subscriber's line having a certain resistance sleeve circuit, a second called subscriber's line having a certain other resistance sleeve circuit, a link-circuit for interconnecting said calling line and either of said called lines, a super-visory relay in said link circuit operating when the called subscriber answers, a meter, a marginal relay controlled over the sleeve of said link circuit and adapted to be operated when said link circuit is connected with one of said called lines and not with the other, and means jointly controlled by said supervisory relay and said marginal relay for operating said meter."

The Examiner of Interferences held that the appellants had not sufficiently disclosed

the subject-matter of counts 1 and 5 in their British application, and fixed their United States filing date, September 6, 1924, as their date for conception and reduction to practice as to said counts. As to the other counts, he gave them the date of their British application, October 8, 1923, for such conception and reduction to practice. As to Levis, he found a date of conception as to counts 3, 4, 5, and 6, on September 21, 1923, as to counts 1 and 2 on March 28, 1925, and reduction to practice of all on March 28, 1925.

The Board of Appeals found a date of conception in Levis of September 21, 1923, of the invention of the issue. As to the point raised by the Examiner of Interferences relative to counts 1 and 2, the Board held that these counts contained nothing patentable over the other counts, and that the date of their conception became therefore immaterial. As to reduction to practice, the Board held Levis was diligent from the date of his conception until his reduction to practice on March 28, 1925. Priority was therefore awarded to the junior party, Levis, on all the counts.

The subject-matter involved in this interference relates to the metering of messages in manual telephone systems. The purpose is to meter all calls through subscribers' lines, or other lines where tolls are to be paid, and to omit such metering when the call goes over an official line, such as information, chief operator, etc. This is done by inserting in the cord circuit a marginal relay. In the subscribers' lines, the sleeve circuits have a low resistance, while in the official lines the resistance is high. The marginal relay, controlling the operation of the meter, transmits the calls over the low resistance lines through the meter, but prevents the calls over the high resistance lines from being so transmitted.

It is conceded, on the oral argument, that the appellee conceived his invention on September 21, 1923, except as to said counts 1 and 2, and that the appellants conceived and reduced to practice on October 8, 1923. No question is raised as to the operativeness of appellee's device, and it is conceded that appellee was not spurred into activity by the entry of appellants into the field.

 The first question for consideration is: Did the appellee reduce to practice on March 28, 1925, or is he, as he claims, entitled to an earlier date for such reduction, namely, December 27, 1923, or May 1, 1924?

The record shows that in 1923, and for several years prior thereto, Levis had been employed as a telephone engineer and circuit designer by the Stromberg-Carlson Telephone Manufacturing Company of Rochester, N. Y., the assignee of Levis' application here involved. In 1923, the Rochester Telephone Corporation was in the market for an exchange in Rochester, afterwards installed and known as the Culver office.

The Stromberg-Carlson Company had been attempting to sell a superservice type of switchboard, designed by Levis, to the Rochester Telephone Corporation for this new exchange. At that time much public criticism had been aimed at the Rochester Corporation because of its inauguration of a system of metering messages, and it was desired to install in the new exchange devices which would obviate some of the difficulties encountered in this metering. A conference was had on September 20, 1923, between some of the officers of the Rochester Corporation and of the Stromberg-Carlson Company, and at this conference Levis, speaking for his employer, called attention to the fact that automatic metering might be provided in the superservice type of system which would meter subscribers' calls and omit the same when the calls were on official or other noncharge lines. On this same day Levis disclosed to W. J. Vincent, consulting engineer of the Rochester Telephone Corporation, his idea of introducing a high resistance in the sleeve circuit of an official line and a relatively low resistance in the sleeve circuit of an unofficial line, and that "a marginal relay in each cord circuit would be provided to operate in series with the resistance of an unofficial line but would not operate in series with the high resistance of an official line. This margin relay in conjunction with a supervisory relay of the cord circuit controlled the opening or closing of the meter controlling circuit."

On September 21, 1923, a sketch of this idea was prepared by Levis and exhibited to Vincent, which is in evidence and marked Exhibit No. 3. This sketch is thus explained by the witness Levis:

"* * * The circuits of this sketch were intended to be incorporated in our superservice type of cord circuit, which is indicated by the fact that certain of the relays are designated by numbers such as No. 4, No. 5, No. 6, No. 9, No. 10, No. 13, and No. 14, which are numbers which we have arbitrarily assigned to designate these relays in our superservice type of cord circuit. At the right of this sketch there are indicated two telephone lines, one of which is designated 'line' and the other is designated 'official,

busy-back, desk, trunks, etc.' The sleeve circuit of the 'line' bears the legend 'low' while the official line bears the legend 'high.' In addition the line has a resistance unit marked '500 ohms' and the official line a corresponding resistance unit marked '1000 ohms.' "

Prior to December 27, 1923, Levis, with the help of an assistant engineer, set up the metering arrangement of Exhibit 3 in the laboratory of the Stromberg-Carlson Company. Levis thus explains what was done:

"Prior to December 27, (Thursday) 1923, with the help of an assistant engineer I set up the metering arrangement of Exhibit 3 in the laboratory of the Stromberg-Carlson Telephone Manufacturing Company. In this set-up we provided an equivalent of a calling telephone line provided with a meter, an official telephone line, an unofficial line and a skeleton cord circuit including a marginal relay similar to that designated 15 ohms in Exhibit 3, a supervisory relay such as No. 6 and other relays such as No. 4, No. 5, No. 10, and No. 14 of Exhibit 3. My recollection of the date of this set-up is fixed by a memorandum from Mr. R. H. Manson, Chief Engineer, to W. R. McCanne, General Manager, of the Stromberg-Carlson Company, stating that the set-up was ready for demonstration on the following Saturday (29th)."

On December 29, 1923, this set-up was demonstrated to a number of officers of the Rochester Corporation and of the Stromberg-Carlson Company. Calls were set up to official and unofficial lines, and a complete demonstration was made at that time, according to Levis, that the calling meter would operate in one case, and would not operate in the other.

Levis testified that he made another demonstration on May 1, 1924, at which time a decision was made as to the best values of resistance for the respective sleeve circuits. Thereafter certain negotiations were conducted, leading finally to the installation of the device as thus set up and demonstrated, in the new exchange in Rochester, where it has since been operated successfully. This exchange was completed and placed in operation on March 28, 1925.

W. J. Vincent, consulting engineer of the Rochester Telephone Corporation, testified that he attended the said conference on September 20, 1923, and corroborated Levis in his statement as to the disclosures he made at this conference relative to his idea of metering only pay messages. He states that on September 21st or 22d, Levis showed him a sketch similar to Levis' Exhibit No. 3, heretofore referred to, and in which the circuit arrangement previously discussed was incorporated. He further states that on December 29, 1923, in company with Messrs. John Boylan, John Morrison, and Harry Gordon, members of the staff of the Rochester Telephone Corporation, and W. R. McCanne, general manager, and Ray H. Manson, chief engineer of the Stromberg-Carlson Company, he witnessed a demonstration by Levis of the circuits of said Exhibit No. 3 in the laboratory of the Stromberg-Carlson Company. As to this demonstration he states: " * * * In this demonstration there was represented a calling telephone line, an unofficial line and an official line together with a cord circuit with all of the relays including the calling supervisory relay shown in Exhibit No. 3. The sleeve circuit in the unofficial line included therein a low resistance and the official line included in its sleeve circuit a relatively high resistance. The telephone line which represented the calling line was provided with a meter and various witnesses of the demonstration operated the set-up to see if calls to unofficial lines would be registered and calls to official lines would not be registered. This demonstration, although those of us who were technically trained never doubted its operativeness after it was originally disclosed to us, completely satisfied us that the circuit arrangement would operate commercially in the system of the Rochester Telephone Corporation. * * * "

The witness Vincent, on being asked as to the resistance values of the different called-line sleeve circuits, said: "I did not measure the resistance values of the official or unofficial line sleeve values used but noted that they were respectively 1000 and 500 ohms since this was noted on the circuit diagram. I was satisfied that these were the values of the resistances in question further by asking Mr. Levis."

Gordon, one of those present at the conference, testified he was present at the demonstration, and states: " * * * It is my recollection that the arrangement discussed included a low resistance in the sleeve circuit of an unofficial line and a relatively high resistance in the sleeve of an official line, the value of these resistances being such that a marginal relay in each cord circuit would operate in series with the low resistance but would not operate in series with the high resistance and further that this marginal relay together with the calling supervisory relay controlled the opening and closing of the metering circuit and was intended to be incorporated in a su-

perservice cord circuit as shown in Levis' Exhibit No. 4. . * * * "

John W. Morrison stated that he was present at the conference on September 20, 1923, and fully corroborates Levis as to what occurred on that occasion. He also stated that he was at the demonstration on December 29, 1923, and states: "On December 29, 1923, in company with W. J. Vincent, Harry E. Gordon and John Boylan, I witnessed at the laboratory of the Stromberg-Carlson Company a *demonstration of the automatic metering arrangement subsequently installed and now in use in the Culver exchange.*" (Italics ours.)

R. H. Manson also stated that he was present at both the conference and the demonstration. As to the demonstration he states: " * * * The following Saturday, which was December 29, 1923, John Boylan, John Morrison, Harry Gordon, and W. J. Vincent of the Rochester Corporation and Mr. McCanne, myself, Mr. Levis and others witnessed and operated the demonstration equipment relating to automatic metering which functioned to our complete satisfaction."

Both tribunals in the Patent Office have held that the conference of September 20, 1923, together with the sketch of September 21, 1923, demonstrated a conception by Levis of the subject-matter of the counts of this interference. From this it must be deduced that said tribunals were of opinion that all essential details of the invention were incorporated in the disclosures made at said conference and in said sketch. This conclusion is certainly justified by the facts as they appear from this record. There can be no doubt, after consideration of the testimony and said Exhibit No. 3, that Levis had a full comprehension of the problems involved, and had arrived at and disclosed a satisfactory solution of the same.

This being true, we are at a loss to appreciate why the demonstration of December 29, 1923, is held by the Examiner, and by inference by the Board, not to be a reduction to practice of the subject-matter of the counts in issue. If the disclosure of September 20th and 21st was complete, then the set-up of the device in the laboratory of the Stromberg-Carlson Company on December 29th, which the witnesses state followed in every detail the plan outlined on Exhibit No. 3, must be considered to be a reduction to practice of that plan. It does not appear in any way from the argument of counsel, from the decisions of the Patent Office tribunals, or

otherwise, that any different conditions exist in the installation of this metering system in a telephone exchange than existed in the laboratory of the Stromberg-Carlson Company when the demonstration was made. In fact, counsel for the appellants insist in their brief filed herein that "in the present instance where the invention was simple and required a very short time to reduce to practice, it is believed that the word 'reasonable' does not cover a period of two and a half months of total inactivity."

The burden of this argument by appellants' counsel is that it was not necessary for Levis to wait until a new building and new plant was constructed to reduce his invention to practice. From this argument we gather that it is not seriously contended here that a laboratory test and demonstration, if complete, should not be considered a reduction to practice.

We are of opinion that the demonstration of December 29, 1923, constituted a reduction to practice, and that the party Levis is entitled to that date therefor. There is, in our opinion, proof of sufficient diligence on the part of Levis from immediately before October 8, 1923, to the time of his said reduction to practice.

As to counts 1 and 2 the Board of Appeals has held that neither of them are patentable over counts 3, 4, 5, and 6. In other words, if priority should be awarded to Levis on counts 3, 4, 5, and 6, and to Capek and Van Den Broecke on counts 1 and 2, patents could not issue to both, and Levis must be the prevailing party, he being the first inventor. Proceeding upon this theory, the Board awarded priority on all the counts to Levis.

The only question before us here is that of priority of invention. Kreag v. Geen, 28 App. D. C. 437. We are without jurisdiction, in interference matters, to pass upon any question except that of priority, including in such priority such matters as may be ancillary thereto. Podlesak v. McInnerney, 26 App. D. C. 399; Gowen v. Hendry, 37 F. (2d) 426, 17 C. C. P. A. 789.

A similar question to that involved here was raised in Prichard v. Setzler, 54 App. D. C. 266, 296 F. 1013, 1014. There, priority of invention as to count 1 was awarded to Setzler, and as to count 2 to Prichard, but with instructions to the Primary Examiner that count 2 be rejected as unpatentable over count 1. Cross-appeals were taken to the Court of Appeals. The court said, in part: "We also agree with the Patent Office

481

that Prichard's device formed a proper basis for claiming the subject-matter of both counts, and that, if there is a patentable distinction between the two counts, Prichard must prevail as to count 2, because, as found by the Office, Setzler did not replenish the contents of the still during his runs. The position taken by the Office that there is no patentable distinction between these two counts, because the prior art supplied the additional step defined in count 2, apparently is sound; but, inasmuch as our jurisdiction here is limited to a determination of the question of priority, we are not at liberty to pass upon this ruling."

Afterward Prichard pressed claim 8 of his patent application, which had been count 2 of said interference, and the same was rejected upon the ground stated in Prichard v. Setzler, supra, namely, that it was not patentable over Setzler's claim represented by count 1 of said interference. The Court of Appeals sustained the concurring decisions of the Patent Office. In re Prichard, 57 App. D. C. 347, 23 F. (2d) 768.

Reference, in this connection, is also had to Norling v. Hayes, 37 App. D. C. 169, and authorities therein cited.

 The difficulty about the situation presented by the case at bar is this: The Board of Appeals has awarded priority on all six claims to the party Levis. If this decision be affirmed here, patent will issue to Levis on his claims corresponding to said counts. This will result in depriving the parties Capek and Van Den Broecke of any opportunity to have an adjudication of the question of the patentability of their claims corresponding to said counts 1 and 2 over Levis' claims corresponding to said counts 3, 4, 5, and 6. This right they are clearly entitled to, under the law.

This being true, it follows that the Board of Appeals should have passed upon the question of priority as to said counts 1 and 2, upon the merits. If it was determined by the Board that, on the record, Capek and Van Den Broecke were entitled to priority as to said counts 1 and 2, but that said counts were unpatentable over said counts 3, 4, 5, and 6, then priority should have been awarded to Capek and Van Den Broecke upon said counts 1 and 2, with instructions to the Primary Examiner to refuse to allow the claims corresponding to said counts in Capek and Van Den Broecke's application for patent. This would be following the practice in Prichard v. Setzler, supra. In such case, if the parties Capek and Van Den Broecke were not

willing to accept such decision of the Primary Examiner, appeal would be prayed to the Board of Appeals, and thereafter to this court, on this question of patentability. If, on the other hand, the Board of Appeals finds upon the merits that Capek and Van Den Broecke are not entitled to an award of priority upon said counts 1 and 2, but that priority as to them should be awarded to the party Levis, an appeal upon this question may bring that matter to this court for adjudication.

While we differ with the conclusion of the Board of Appeals as to the date of reduction to practice, we are of opinion that priority was properly awarded to the party Levis on counts 3, 4, 5, and 6. As to counts 1 and 2, the decision of the Board of Appeals is reversed, and the matter is remanded to the Board of Appeals, with directions to pass upon the question of priority thereon, on the merits, and to make an order therein in harmony with the suggestions hereinbefore made.

Modified.

BLAND and LENROOT, Associate Judges, dissent as to conclusion as to counts 1 and 2.